**REVERSED and REMAND and Opinion Filed December 31, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00028-CV

**THE STATE OF TEXAS, Appellant**
**V.**
**MESQUITE CREEK DEVELOPMENT, INC., A GEORGIA CORPORATION AND**
**RACETRAC PETROLEUM, INC., A GEORGIA CORPORATION,**
**Appellees**

**On Appeal from the County Court at Law No. 2**
**Dallas County, Texas**
**Trial Court Cause No. CC-14-05842-B**

## OPINION
Before Justices Myers, Nowell, and Evans
Opinion by Justice Evans

The State of Texas appeals the trial court's monetary judgment dismissing the State's condemnation suit against appellees Mesquite Creek Development, Inc. and RaceTrac Petroleum, Inc. (together RaceTrac). After RaceTrac withdrew from the registry of the court the special commissioners' award of $966,531, the trial court granted RaceTrac's motion to dismiss for lack of subject matter jurisdiction due to the State's pre-litigation failure to disclose an appraisal report. The trial court also awarded RaceTrac judgment in the net amount of $1,321,945.93.

In its first two issues, the State asserts, among other arguments, the trial court erred in dismissing the case because the landowner waived any pre-litigation noncompliance with statutory requirements when it withdrew the special commissioners' $966,531 award and because the pre-litigation failure to deliver the appraisal report is not a jurisdictional defect. In its third issue, the State argues the trial court erred when it awarded RaceTrac $1,321,945.93. We reverse and remand.

## I.
### BACKGROUND

RaceTrac's affiliate, Mesquite Creek, owned property close to the intersection of Beltline Road and Interstate Highway 35 E in Carrollton. Mesquite Creek leased the property to RaceTrac for use as a gas station and convenience store. Some 4,800 square feet of RaceTrac's 34,180-square-foot property were identified by the Texas Department of Transportation as necessary for its project to expand IH-35E through Carrollton. The portion taken deprived the remainder of access to Belt Line Road impacting the use and value of the remainder.

The following aerial photograph (from the appraisal report in dispute in this appeal) depicts the property marked to show the portion taken results in reduced access of the remainder. Although IH-35E is just out of the frame to the left (approximately parallel to North Broadway Street), the edge of the IH-35E service road as it intersects with Beltline Road is in the lower, left corner.

–2–



TxDOT awarded the design-build contract for the segment of the project at issue in this case to a joint venture of design and construction firms called AGL Constructors. In turn, AGL contracted with HDR Engineering, Inc. to hire and supervise appraisers and assist with acquisition of land. On June 21, 2013, TxDOT notified RaceTrac of the project, the design-build contract with AGL, its contract with HDR, and that any necessary property would be acquired in the name of the

State.  The notice letter enclosed the "State of Texas Landowner's Bill of Rights" and an Internet URL where the bill of rights could be located.[1]

HDR employed Darren Fox to review and approve appraisal reports before they were used to make offers to acquire land necessary for the project.  HDR contracted with Aaron Wright to appraise the subject property, both the part to be taken and damages to the remainder.  Wright submitted to Fox Wright's appraisal report signed and dated August 19, 2013, opining total compensation due RaceTrac was $2,079,514 as of July 11, 2013.[2]  Fox explained by affidavit testimony the events that resulted in the report not being provided to TxDOT:

> When Mr. Wright turned over his appraisal report concerning the subject property to HDR in 2013, it was my job to review the report and provide feedback to Mr. Wright.  I spoke with Mr. Wright by phone and by email regarding his appraisal report.
>
> I asked Mr. Wright whether he would review and consider a 'land plan' drafted by a land planner that analyzed the Subject Property's remainder property.  Mr. Wright said that he would not, and that he was too busy to consider a land plan.  Mr. Wright was also difficult to contact and did not receive critical feedback positively.
>
> Based off Mr. Wright's busy schedule and the difficulty I experienced in contacting him, Mr. Wright and HDR made a mutual decision that Mr. Wright would not conduct appraisals on the IH-35E project.

---

[1] www.oag.state.tx.us/agency/landowners.shtml.

[2] The State characterizes Wright's report as a draft report.  To the extent it is not signed by a "Reviewing Appraiser" it may be a draft report.  But Wright signed and dated his report as a licensed certified general real estate appraiser.  The report comprises eighty-nine pages and contains a thorough appraisal of the value of the property to be taken and damages to the remainder.

I directly told Mr. Wright that he should not raise or lower his concluded opinions of value based solely off feedback from any review appraisers. I have never asked Mr. Wright to alter his opinion of value.

After Wright and HDR parted ways, Wright was no longer under contract to appraise the Subject Property or to testify at a Special Commissioners' Hearing. As the appraisal report was not finalized, I did not consider it an appraisal report and HDR did not turn it over to TxDOT.

HDR retained Brad Pitt to appraise the property. Pitt signed his appraisal report on November 13, 2014, in which he opined total compensation due RaceTrac was $966,531 as of October 23, 2014.[3] When agreement could not be reached for the State to purchase the property, the State filed a condemnation suit on November 19, 2014. On November 26, 2014, the trial court appointed three special commissioners.

On December 1, 2014, counsel for RaceTrac filed a notice of appearance. On December 8, 2014, Andrew J. McRoberts transmitted to RaceTrac's counsel McRoberts's appraisal report for RaceTrac's property dated December 8, 2014, opining RaceTrac deserved total compensation of $3,063,000 as of December 6, 2014. On January 14, 2015,[4] McRoberts transmitted to RaceTrac's counsel

---

[3] In the subsequent litigation phase, the State also retained Christi Glendinning to appraise the property. Glendinning opined total compensation due RaceTrac was $1,578,196 as of March 20, 2015.

[4] McRoberts uses January 14, "2014" in his transmittal and several places in his report. But it appears each is a typographical error resulting from his reuse of his December 8, 2014 report and its transmittal. Whether McRoberts issued and delivered his report on January 14, 2014 or 2015 is not material to our decisions in this opinion.

–5–

McRoberts's appraisal report bearing the same date opining the compensation due RaceTrac was $3,499,020.

In summary, before the special commissioners' hearing, the parties or their agents possessed evaluations of the total compensation due RaceTrac in these amounts:

• $2,079,514 as of 07/11/2013—Wright's 8/19/2013 report;

• $966,531 as of 10/23/2014—Pitt's 11/13/2014 report;

• $3,063,000 as of 12/6/2014—McRoberts's 12/8/2014 report; and

• $3,499,020 as of 12/6/2014—McRoberts's 1/14/2015 report.

The special commissioners hearing was noticed for February 17, 2015, and on February 19 the special commissioners awarded the amount in Pitt's report, $966,531. That same day, RaceTrac filed its objection to the award. The State deposited the award into the registry of the court in order to acquire possession of the property to construct the project. By motion filed April 3, 2015, and order signed April 17, 2015, RaceTrac withdrew the award from the registry of the court.

While the case was in discovery, a TxDOT employee, Jenifer Houdmann, sought to gather up documents for the litigation by, among other things, requesting AGL and its subcontractor HDR if there was another appraisal on this parcel. The responsive email attached Wright's appraisal. She was "shocked . . . [b]ecause we should have had that in our file. It should have been provided to the property owner. Especially since HDR had been instructed to provide all [appraisals] to the property

owners."  Further, in answer to the question, "[H]ad TxDOT and its agents been in compliance with Texas law on that issue, that appraisal would have gone to RaceTrac as the landowner," she answered, "Absolutely."

RaceTrac moved to dismiss the case based on TxDOT's pre-litigation failure to disclose Wright's appraisal report.  The trial court ruled the case should be dismissed and ordered RaceTrac to submit its damages, fees, and costs.  The trial court found RaceTrac's attorney's fees at the trial court, litigation expenses, expert witness fees, damages for temporary loss of use of the condemned land, lost profits from the business being closed, costs for removal of underground storage tanks, and expenses to close and secure the store aggregated to $2,288,476.93.  After allowing an offset of $966,531 for the amount RaceTrac withdrew from the registry of the court, the trial court entered judgment for $1,321,945.93.  The State timely perfected this appeal.

## II.
### APPLICABLE LAW

#### A. Standards of Review

We and other courts of appeal have articulated our review of trial courts' rulings on motions to dismiss condemnation cases in terms of abuse of discretion. *See City of Dallas v. Highway 205 Farms, Ltd.*, No. 05-13-00951-CV, 2014 WL 3587403, at *3 (Tex. App.—Dallas July 22, 2014, pet. denied) (mem. op.) ("[T]he trial court abused its discretion when it dismissed this condemnation proceeding

–7–

when there was no judicial case before it."); *State v. Ellison*, 788 S.W.2d 868, 873 (Tex. App.—Houston [1st Dist.] 1990, writ denied) ("[T]he trial court did not abuse its discretion when it dismissed the State's lawsuit for want of prosecution and abandonment, and reinstated the special commissioners' award."); *Culligan Soft Water Serv. v. State*, 385 S.W.2d 613, 616 (Tex. App.—San Antonio 1964, writ ref'd n.r.e.) ("The trial court overruled the motion to dismiss, and unless the court abused its discretion in doing so, its action should not be disturbed."). None of these opinions contains an analysis or citation to authority for using an abuse of discretion standard of review.[5]

The State argues other courts of appeals have decided de novo was the correct review standard. In *Harris County Hospital District v. Textac Partners I*, the court determined that the motion to dismiss functioned as a motion for summary judgment and so the standard of review should be de novo. 257 S.W.3d 303, 312 (Tex. App.—Houston [14th Dist.] 2008, no pet.). In <u>*Textac*</u>, the issue was whether the hospital district had the power to condemn the property, a matter of law. *Id*. Similarly, in *Valero Eastex Pipeline Co. v. Jarvis*, the court of appeals decided a de novo standard of review applied because the trial court had decided as a matter of law the property

---

[5] The articulation in terms of abuse of discretion in our prior panel opinion in *Highway 205 Farms* is not a holding necessary to the outcome because the outcome would not change if the standard was de novo review instead of abuse of discretion. If the abuse of discretion standard had been one of the holdings in *Highway 205 Farms*, we as a panel would have to follow it unless our Court sitting en banc or the supreme court had reversed its holding. *See Brazos Elec. Power Coop., Inc. v. Tex. Comm'n on Envtl. Quality*, 576 S.W.3d 374, 383 n.6 (Tex. 2019).

was not necessary for the project and dismissed the case. 990 S.W.2d 852, 856 (Tex. App.—Tyler 1999, pet. denied).

Here, RaceTrac's motion sought dismissal based on the trial court's lack of jurisdiction due to the State's pre-litigation noncompliance with a statutory requirement. The State's dispute about whether Wright's report is final or a draft is not a factual dispute but rather addresses how to properly characterize the facts. The State also disputes whether it is responsible under the condemnation statutes for the failure of HDR or AGL to deliver Wright's appraisal report to RaceTrac. This is a dispute about the legal significance of the facts, but not a factual dispute. Neither party disputes the material facts we summarized above. So, RaceTrac's motion functioned similarly to a plea to the jurisdiction on undisputed facts or a motion for summary judgment, both of which we review de novo. *See AEP Tex. Cent. Co. v. Arredondo*, No. 19-0045, 2020 WL 6811465, at \*2 (Tex. Nov. 20, 2020) ("We review an order granting summary judgment de novo . . . ."); *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007) ("A plea questioning the trial court's jurisdiction raises a question of law that we review de novo."). Accordingly, on this record we decide the applicable standard of review is de novo.

"We construe statutes . . . de novo and ascertain the legislature's intent from the plain meaning of the words in the statute." *N.E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243, 253 (Tex. 2020). "When interpreting statutes, we look to the plain meaning of the enacted text. We must enforce the statute as written and refrain from

rewriting text that lawmakers chose." *KMS Retail Rowlett, L.P. v. City of Rowlett*, 593 S.W.3d 175, 183 (Tex. 2019) (quotation omitted).

## B. Condemnation Procedure

A condemning authority must proceed through three phases to obtain property from an owner who is unwilling to voluntarily convey its property to the condemning authority: a pre-litigation phase, an administration phase commenced by the filing of a condemnation lawsuit, and a traditional litigation phase. Because the parties' dispute in this case focuses on the pre-litigation phase, we do too. *See* TEX. PROP. CODE § 21.011 ("Exercise of the eminent domain authority in all cases is governed by Sections 21.012 through 21.016 of this code.").

### *Condemnation Pre-Litigation Phase*

In the pre-litigation phase, the condemning authority must deliver the landowner's bill of rights statement "before or at the same time as the entity first represents in any manner to the landowner that the entity possesses eminent domain authority." *See id.* § 21.0112(a) (obligation to deliver bill of rights statement); TEX. GOV'T CODE § 402.031 (content of bill of rights statement). If the condemning authority is a governmental entity, it must maintain the bill of rights statement on the Internet. *See* PROP. § 21.0112(b)(2). The condemning authority and property owner may agree to a conveyance, but before filing suit, the condemning authority must make a "bona fide offer" to the property owner. *See id.* § 21.0113(a).

A "bona fide offer" has been made if the condemning authority makes an initial offer in writing and at least thirty days later makes a final offer that offers at least the amount of a written appraisal report obtained by the condemning authority. *See id.* § 21.0113(b). The statute further conditions that to be a bona fide offer, the condemning authority must provide certain things in conjunction with its final offer, stating "the following items [must be] included with the final offer or have been previously provided to the owner" by the condemning authority: "(A) a copy of the written appraisal;" "(B) a copy of the deed, easement, or other instrument conveying the property sought to be acquired;" and "(C) the landowner's bill of rights statement . . . ." *Id.* § 21.0113(b)(6). Section 21.0113(b)(6) incorporates the requirement that "at the time" the condemning authority makes "an offer," the condemning authority must disclose to the landowner, by delivering copies, "any and all appraisal reports produced or acquired by the entity relating specifically to the owner's property and prepared in the 10 years preceding the date of the offer." *See id.* § 21.0111(a). If agreement cannot be reached, then seven days before filing its condemnation lawsuit, the condemning authority must deliver again the landowner's bill of rights statement. *See id.* § 21.0112(a).

### *Condemnation Administrative Phase*

The condemning authority thereafter may file its condemnation lawsuit, which has specific statutory requirements, including requirements to plead that a bona fide offer was made and the parties were unable to reach agreement. *See id.*

–11–

§ 21.012(b). The judge assigned by rotation—*see id.* § 21.013(d)—must appoint three disinterested special commissioners to assess damages fairly, impartially, and according to the law. *See id.* § 21.014. The special commissioners must admit evidence of certain matters related to the property being condemned and damages to the remainder. *See id.* § 21.041. Their award must be according to the evidence, and certain methods of deciding the damages are provided for by statute and may include costs and fees. *See id.* §§ 21.042, .043, .044, .047, 048. Unless a timely objection is filed, the court shall issue judgment on the award. *See id.* § 21.061.

### *Condemnation Litigation Phase*

Either the condemning authority or property owner may object to the special commissioners' award by timely filing a written objection. *See id.* § 21.018. Once objections are filed, the administrative proceeding converts into a normal pending cause in the trial court and the special commissioners' award is vacated. *See Denton Cty. v. Brammer*, 361 S.W.2d 198, 200 (Tex. 1962). To avoid the impact of protracted litigation on the progress of projects for which property is condemned, a condemning authority may take possession of the property during litigation that continues after the special commissioners' award only if the condemning authority meets certain statutory requirements. *See generally* PROP. § 21.021. The method most often used by governmental entities is to deposit the amount of the special commissioners' award into the registry of the court. *See id.* § 21.021(b).

–12–

### *Withdrawal of Award*

A property owner may withdraw the award from the registry of the court with consequences: "After an award has been made, and the money deposited in the registry of the court and the landowner has withdrawn the same, he cannot thereafter contend that the taking was unlawful." *Tejas Gas Corp. v. Herrin*, 716 S.W.2d 45 (Tex. 1986) (quotation omitted). "This statement is an absolute rule of law which does not yield to surrounding circumstances." *Id*. at 46. After a property owner withdraws the award, the only remaining issue is the adequacy of the compensation, as summarized thoroughly by the supreme court:

> We have said that if the owner has accepted the commissioners' award and withdrawn the money from the registry of the court, the court has jurisdiction to adjudicate either the landowner's or the State's contest of the commissioners' award, even though there was no proof of an effort to agree with the owner. Another decision, in which we refused the application for writ of error, said that if "the owner of the land sought to be condemned makes his appearance before the special commissioners and resists the condemnation proceedings upon the merits, he thereby waives whatever lack of efforts to reach a settlement there might have been." Several other courts of appeals have likewise said that a landowner can waive the right to complain about the existence or adequacy of an effort to agree by appearing before the commissioners and resisting condemnation or contesting the amount of damages, or by withdrawing the Commission's award from the court's registry. In those cases, the only issue to be tried was the owner's complaint that the damages were inadequate.

*Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172, 181–82 (Tex. 2004) (quoting *Jones v. Mineola*, 203 S.W.2d 1020, 1023 (Tex. Civ. App.—Texarkana 1947, writ ref'd); *see also Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d

136, 143 (Tex. 2019) (recognizing in *Hubenak* it "disapprov[ed] at least sixteen court of appeals decisions spanning over seventy years," because "a long history of mistaken application alone is insufficient to counsel against correcting the error"). The court reasoned the statutory requirements were mandatory but not jurisdictional, observing the "modern direction of policy is to reduce the vulnerability of final judgments to attack on the ground that the tribunal lacked subject matter jurisdiction." *Hubenak*, 141 S.W.3d at 182. So the effect of the property owner's withdrawing of the award is a waiver of the property owner's complaints about all issues, including whether pre-litigation procedures were followed, except the adequacy of the award. *Id.*

As mentioned in *Hubenak*, even the property owners' appearance and participation on the merits at the special commissioners' hearing waives "any complaints regarding prelitigation matters including the failure of the State to make a bona fide offer or the inability of the parties to agree on damages." *State v. Royal Cent. Condo. Owners*, No. 05-96-00944-CV, 1997 WL 66712, at *2 (Tex. App.— Dallas Feb. 18, 1997, writ denied) (not designated for publication) (citing and summarizing authorities). Instead of dismissal, the "trial de novo affords the parties adequate relief for any errors occurring in the proceedings up to and including the special commissioners' award." *Id.* at *3 (citing *Tonahill v. Gulf States Utils. Co.*, 446 S.W.2d 301, 302 (Tex. 1969)).

We address later in this opinion RaceTrac's arguments that *Hubenak* does not apply because the statutory violation in this case is jurisdictional.

### *Abatement for Failure to Make Bona Fide Offer*

The specific defect complained of in *Hubenak* was the condemning authority's failure to adequately plead the parties were unable to agree in the pre-litigation phase. Having decided the matter was not jurisdictional, the supreme court decided abatement for a reasonable time was the proper remedy. *Hubenak*, 141 S.W.3d at 184.[6] Courts of appeals have understood that *Hubenak* "held that when a party fails to meet a governing statutory provision, the proper remedy is to abate to correct the violation, rather than to dismiss." *Tex. Cent. R.R. & Infrastructure, Inc. v. Miles*, No. 13-19-00297-CV, 2020 WL 2213962, at *7 (Tex. App.—Corpus Christi–Edinburg May 7, 2020, pet. filed) (mem. op.).

After the supreme court decided *Hubenak*, the legislature enacted a statutory abatement provision to remedy a condemnor's failure to comply with § 21.0113's requirements of a bona fide offer:

---

[6] The supreme court reasoned:

> [T]the statute's goal—avoidance of protracted litigation—can be accomplished by requiring an abatement of the proceeding until the requirement that the parties "are unable to agree" has been satisfied. While the condemnation proceedings are abated, the parties can engage in negotiations for the land to be condemned, just as they would have done before the proceedings were initiated. We therefore conclude that if a landowner objects in a pleading that there has been no offer, and a trial court finds that the requirement that the parties are "unable to agree on the damages" has not been met, the trial court should abate the proceedings for a reasonable period of time to allow the condemnor to satisfy the "unable to agree" requirement. If at the end of a reasonable period of time, the condemnor has not made an offer, the condemnation proceeding should be dismissed.

*Hubenak*, 141 S.W.3d at 184 (footnotes omitted).

–15–

If a court hearing a suit under this chapter determines that a condemnor did not make a bona fide offer to acquire the property from the property owner voluntarily as required by Section 21.0113, the court shall abate the suit, order the condemnor to make a bona fide offer, and order the condemnor to pay:

> (1) all costs as provided by Subsection (a); and

> (2) any reasonable attorney's fees and other professional fees incurred by the property owner that are directly related to the violation.

PROP. § 21.047(d). We reiterate, the requirement imposed by § 21.0113(b)(6)—that in order to have made a bona fide final offer, a condemning authority must deliver its appraisal reports before or with the offer—incorporates the requirement imposed by § 21.0111(a) that "at the time" the condemning authority makes "an offer," the condemning authority must disclose to the landowner, by delivering copies, "any and all appraisal reports produced or acquired by the entity relating specifically to the owner's property and prepared in the 10 years preceding the date of the offer." *See id*. § 21.0111(a).

### III.
#### ANALYSIS

In its first and second issues, the State argues the trial court erred when it dismissed this condemnation lawsuit due to the State's failure to disclose Wright's appraisal report to RaceTrac when making its bona fide offer to purchase the property. RaceTrac's sole ground in its motion to dismiss was, "The proceeding should be dismissed because the State's failure to comply with Section 21.0111

–16–

renders these proceedings void." That is, RaceTrac argued the State's pre-litigation failure to deliver Wright's report deprived the trial court of subject matter jurisdiction that could not be waived by RaceTrac's withdrawal of the special commissioner's award.

For the purposes of our analysis, we will assume without deciding that on the facts of this case, TxDOT cannot escape compliance with the pre-litigation statutory requirements, such as delivery of Wright's appraisal report, merely by contracting performance of that phase to private parties. The facts of this case include not only TxDOT having contracted the pre-litigation phase to private parties AGL and HDR, but also TxDOT doing nothing on its own to comply. In other words, if TxDOT does not rely for its proof in this condemnation suit on AGL and HDR's conduct—both their acts and their omissions—then TxDOT cannot otherwise prove it complied with the pre-litigation statutory requirements. We also will assume TxDOT's employee, Houdmann, was correct when she testified Wright's report "[a]bsolutely" should have been delivered to RaceTrac. But for our purposes, we need not decide these questions; it is sufficient to make assumptions favorable to RaceTrac.

### *Impact of* Hubenak

We agree with the State that when RaceTrac withdrew the award it waived any complaint about whether pre-litigation procedures were followed and waived all other issues except its complaint about the adequacy of the award. *See Hubenak*,

141 S.W.3d at 181–82; *Herrin*, 716 S.W.2d at 45.  RaceTrac argues that because the statutory pre-litigation procedures are mandatory they are jurisdictional and, thus, cannot be waived.  But the supreme court recognized in *Hubenak* that while the pre-litigation requirements are mandatory, they are not jurisdictional and are waived by withdrawal of the award:

> Thus, although section 21.012's requirements are mandatory, the trial courts in these consolidated cases had jurisdiction over the condemnation proceedings regardless of whether the condemnors satisfied the requirement that the parties "are unable to agree on the damages." *We therefore disapprove of those court of appeals decisions that have held or suggested that these statutory requirements are jurisdictional.*

*Hubenak*, 141 S.W.3d at 183 (emphasis added).

We thoroughly laid out the statutory condemnation procedure and labeled it as a separate phase of the condemnation process in recognition of RaceTrac's argument that a significant purpose of the procedures is to protect property owners from governmental abuse.  That is certainly true and is part of the purpose not only of Texas's condemnation statutory procedures but also the applicable constitutional protections.  *See* U.S. CONST. amend. V; TEX. CONST. art. I, § 17.  But RaceTrac's argument from that premise that we must view the pre-litigation procedures as jurisdictional was rejected by the supreme court in *Hubenak*, as we explained above.

### *Adequate Remedies of De Novo Trial and Abatement*

RaceTrac is concerned that if we do not view the State's pre-litigation non-compliance with the appraisal report disclosure requirement as jurisdictional

subjecting the condemnation suit to dismissal, condemning authorities will take it as a license to ignore the pre-litigation requirements that protect property owners from an oppressive government. We share RaceTrac's underlying concern.[7] Here, however, RaceTrac was not induced by the State's nondisclosure of Wright's report to accept an offer on the State's behalf "equal to or greater than the amount of [Pitt's] appraisal report" of $966,531 instead of a much larger offer "equal to or greater than the amount of [Wright's] appraisal report" of $2,079,514. *See* PROP. § 21.0113(b)(5). Instead, RaceTrac rejected all the State's offers and the special commissioners' award that was based on Pitt's appraisal report. RaceTrac protected itself by its objection to the special commissioners' award and its pursuit of the de novo proceedings in the litigation phase, which, after remand, will result in a trial de novo on the amount of compensation due to RaceTrac. Both the supreme court and this Court have decided the de novo litigation is RaceTrac's "adequate remedy for anything that may occur in the condemnation proceedings up to and including the

---

[7] We discern in RaceTrac's argument a more sinister scenario involving property owners who cannot afford their own appraisal report, as RaceTrac obtained here. Unless condemning authorities disclose all their appraisal reports, such property owners might accept a condemning authority's offer based on the lowest appraisal exactly because the condemning authority fails to comply with section 21.0111(a) by not disclosing its higher appraisals. The need for the legislature to consider enacting statutory safeguards for such property owners does not alter how we interpret the statute as enacted. "When interpreting statutes, we look to the plain meaning of the enacted text. We must enforce the statute 'as written' and 'refrain from rewriting text that lawmakers chose.'" *KMS Retail*, 593 S.W.3d at 183. Or as Justices Ginsburg and Scalia wrote, "a reviewing court's 'task is to apply the text [of the statute], not to improve upon it.'" *E.P.A. v. EME Homer City Generation, L.P.*, 572 U.S. 489, 508–09 (2014) (Ginsburg, J., for majority) (quoting *Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 126 (1989) (Scalia, J., for majority) ("Our task is to apply the text, not to improve upon it.")). RaceTrac's solution that we should view section 21.0111(d) as jurisdictional and thus entitling it to dismissal of this condemnation case does not provide a solution to owners who accepted a condemning authority's pre-litigation offer where the condemning authority failed to disclose higher appraisal reports.

award of the special commissioners." *Tonahill*, 446 S.W.2d at 302; *Royal Cent. Condo. Owners*, 1997 WL 66712, at *3 (same).

Moreover, the legislature provided a remedy of abatement to remedy a condemning authority's failure to make a bona fide offer. *See* PROP. § 21.047(d). The State argues and we agree that RaceTrac's complaint that the State did not deliver a copy of Wright's appraisal report in violation of § 21.0111(a) is a complaint that the State did not comply with the statutory requirements of a bona fide offer, requirements that include of delivery of appraisal reports. *See id*. § 21.0113(b)(2), (6)(A). RaceTrac's complaint, therefore, falls within the scope of § 21.047(d)'s remedy of abatement for violations of § 21.0113.

Even if failure to comply with § 21.0111(a) is separate and distinct from the bona fide offer such that the remedy of statutory abatement is inapplicable, we agree with the State that the supreme court generally provided abatement as a remedy for pre-litigation statutory non-compliance. *See Hubenak*, 141 S.W.3d at 184; *Miles*, 2020 WL 2213962, at *7. We reject RaceTrac's argument that the abatement remedy in *Hubenak* is limited to remedying pleading defects under § 21.012. Indeed, a pleading defect was the issue in *Hubenak*—namely the failure to plead inability to agree pursuant to § 21.012(b)(4). But the supreme court specifically stated abatement should be used to address the substantive, pre-litigation failure underlying the pleading defect: "While the condemnation proceedings are abated, the parties can engage in negotiations for the land to be condemned, just as they

–20–

would have done before the proceedings were initiated." *Hubenak*, 141 S.W.3d at 184.[8] If the only purpose of abatement in *Hubenak* was to remedy a pleading defect, that could have been accomplished without abatement merely by granting leave to file an amended pleading. So, the supreme court's authorization for abatement to include remedying substantive failures to comply with pre-litigation statutory requirements negates RaceTrac's argument. *See id*.

### Section 21.0111(d) Is Not Jurisdictional

RaceTrac argues failure to deliver an appraisal report must be jurisdictional because otherwise § 21.0111(d) would not make sense. Section 21.0111(d) provides:

> A subsequent bona fide purchaser for value from the acquiring entity may conclusively presume that the requirement of this section has been met. This section does not apply to acquisitions of real property for which an entity does not have eminent domain authority.

PROP. § 21.0111(d). RaceTrac argues that pre-litigation failure to comply with the appraisal report disclosure requirements of § 21.0111 must be jurisdictional for the legislature to provide a bona fide purchaser for value is insulated from noncompliance with the section's appraisal report delivery requirement. But RaceTrac does not explain adequately why a provision that is derivative of the condemnation statutory scheme should be construed as an unwaivable jurisdictional provision.

---

[8] *See supra* note 6 (supreme court's full statement).

We return again to *Hubenak* to analyze these arguments. There, the supreme court specifically relied on the "modern direction of policy . . . to reduce the vulnerability of final judgments to attack because the tribunal lacked subject matter jurisdiction." *Hubenak*, 141 S.W.3d at 176. The court in *Hubenak* followed its reasoning in *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 75–77 (Tex. 2000), where the court rejected its previous approach in *Mingus v. Wadley*, 285 S.W. 1084 (Tex. 1926) that had held the failure to follow statutory prerequisites for a statutory cause of action were jurisdictional. *See Kazi*, 12 S.W.3d at 75. Instead, in *Kazi* the court decided statutory prerequisites do not deprive courts of jurisdiction but relate to the plaintiff's right to recover under its statutory cause of action. *Id*. at 77. Consistent with the modern trend, the supreme court has decided "we presume the Legislature did not intend to make a provision jurisdictional and that this presumption can only be overcome with clear contrary legislative intent." *Tex. Mut. Ins. Co. v. Chicas*, 593 S.W.3d 284, 287 (Tex. 2019) (citing *City of DeSoto v. White*, 288 S.W.3d 389, 394 (Tex. 2009) ("Consistent with *Dubai*, then, we begin with the presumption that the Legislature did not intend to make the notice under § 143.057(a) jurisdictional; a presumption overcome only by clear legislative intent to the contrary.")). So we follow the supreme court and presume § 21.0111(d) is not jurisdictional absent "clear contrary legislative intent." *Id*.

The supreme court utilizes four principles to determine whether the legislature clearly intended a statute to set jurisdictional requirements: "(1) the plain meaning

–22–

of the statute, (2) whether the statute contains specific consequences for noncompliance, (3) the purpose of the statute, and (4) the consequences that would result from each construction." *Id*. First, the plain meaning of § 21.0111(a) and (d) is that the condemning authority must deliver to the property owner with an offer all appraisal reports pertaining to the property within the past ten years and that a subsequent good faith purchaser for value may assume that was done. The statute does not use "jurisdiction" or concepts of jurisdiction. The absence of any reference to jurisdiction is a significant factor in this analysis. *See id*. at 288 (statute "does not refer to the trial court's jurisdiction in any way."); *White*, 288 S.W.3d at 395 ("The Code does not contain any explicit language indicating that this notice requirement is jurisdictional."). So the plain language of the statute weighs against construing § 21.0111(d) as a jurisdictional prerequisite.

Second, there are no specific consequences for non-compliance provided for in § 21.0111(a) or (d), and certainly none that pertain to dismissing the suit. The legislature, however, provided for the remedy of abatement in § 21.047(d) for the failure of a condemning authority to have made a bona fide offer resulting from the authority's failure to deliver all appraisal reports as we explained above. *See* PROP. §§ 21.0111(a), 21.0113(b)(6), 21.047(d). The absence of a jurisdictional consequence and the provision of a non-jurisdictional statutory remedy is conclusive the legislature did not intend § 21.0111(d) to be a jurisdictional prerequisite.

–23–

Third, we agree with RaceTrac that one purpose of § 21.0111(a) is to "prevent[] condemnors from shopping for favorable appraisals by requiring disclosure of all appraisals that the condemnor has produced or obtained that value the subject property within the ten years before the taking." The State contests this purpose, but it appears directly from the text of the statute. The requirement in § 21.0111(a) that the State disclose and deliver "any and all" appraisals obtained in the previous ten years expresses the legislature's understanding that condemning authorities may obtain more than one appraisal. And nothing in the pre-litigation statutory scheme prohibits the State from obtaining more than one appraisal and basing its final offer on just one of them. *See id.* § 21.0113(b)(5) (no requirement condemning authority must offer "equal to or greater than the amount of" the highest appraisal obtained or the average of appraisals obtained). So sections 21.0111(a) and 21.0113(b)(5), when taken together, permit the condemning authority to obtain multiple appraisals and to use one for its bona fide offer, but they also require disclosure of all the appraisals obtained on the subject property. This required disclosure of multiple appraisals in conjunction with the condemning authority's offers could have no purpose other than to inform the property owner of the range of expert opinion regarding compensation in order to evaluate the condemning authority's offers. The statute does not prohibit the condemning authority from explaining why it considers one opinion to be unfounded and why it sought other opinions. But, the property owner is entitled to receive copies of all appraisal reports

in conjunction with the condemning authority's offers in order to evaluate the offers and make an informed decision whether to voluntarily accept the final offer.

The legislature's purpose for § 21.0111(d) is equally apparent from its text: to provide a clear, concise, and unequivocal provision so subsequent, good-faith purchasers for value and their title companies may presume the title they acquire from a condemning authority is unimpaired by the litigation prerequisites of delivering all appraisal reports to the owner. Otherwise, the value of the property in the condemning authorities' hands would be less than market value. Such purchasers and their title companies could rely on general legal principles, as RaceTrac argues by citing *Vickery v. Commission for Lawyer Discipline*, 5 S.W.3d 241, 251 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) ("There is a general presumption of validity extending to the judgments of courts of general jurisdiction."). RaceTrac does not cite any authority for its proposition that a general legal principle negates the legislature's prerogative to provide a specific statutory provision in "black and white" to the same effect. Here that "black and white" statute results in condemnation titles being settled and the condemned property being sold by condemnors not having diminished market value merely because title was acquired through condemnation. Nor would one expect to find in such a tangential provision a jurisdictional basis to unravel the whole condemnation process.

Fourth, the consequences of the competing readings of the statute are significant. The State's argument, with which we have agreed, results in

enforcement and compliance with the requirement of disclosure of appraisals as part of a bona fide offer, even if post-litigation abatement is required to achieve the result. *See* PROP. §§ 21.0111(a), .0113(b)(6), .047(d). RaceTrac's view of § 21.0111(d) resulted in the following consequences: (1) dismissal of this condemnation case, (2) enormous financial penalties imposed aggregating to $2,288,476.93—exceeding three of the four appraiser's valuations for the entire compensation due RaceTrac, (3) the State did not acquire the property (even though it was penalized in excess of most of the appraisals), (4) so a highway project that proceeded may now be located on private property, all of which will result in future litigation to resolve the very issue already before the court in this condemnation lawsuit.

There is an additional negative consequence from RaceTrac's view that § 21.0111(d) makes violations of "the requirement of this section" a subject matter jurisdictional defect that cannot be waived. Within "this section" is § 21.0111(b) that requires property owners to disclose their appraisal report to the condemning authority. *See* PROP. § 21.0111(b). Sometimes property owners will fail to do so as happened in this case: we explained above in section I of this opinion the factual basis for the State's complaint that RaceTrac violated § 21.0111(b) when RaceTrac obtained McRoberts's report but did not disclose it to the State within ten days of receipt or three business days before the special commissioners' hearing. RaceTrac's view of 21.0111(d) would make property owners' violations of 21.0111(b) unwaivable subject matter jurisdictional defects. So, if RaceTrac's view

were correct, property owners could permanently obstruct condemning authorities' condemnation of private property by obtaining an appraisal report, refusing to deliver it to the condemning authority, and asserting the condemnation action must be dismissed for lack of subject matter jurisdiction. We find no justification in § 21.0111(d) for the results of RaceTrac's statutory interpretation.

Accordingly, § 21.0111(d) does not contain "clear contrary legislative intent" to alter the presumption the statutory requirements are not jurisdictional. *See Chicas*, 593 S.W.3d at 287; *White*, 288 S.W.3d at 394. We reject RaceTrac's jurisdictional argument from § 21.0111(d).

### *Summary*

Having reviewed sufficient grounds raised by the State and RaceTrac's counterarguments, we conclude the trial court erred when it granted RaceTrac's motion to dismiss for the State's pre-litigation non-compliance with statutory requirements. Because we reverse the entire judgment, including the monetary award, we need not reach the State's remaining issues to fully resolve this appeal.

### IV.
#### CONCLUSION

For the reasons stated above, we reverse the trial court's judgment dismissing this case and awarding damages.

We remand this case to the trial court for further proceedings consistent with this opinion.

/David Evans/
DAVID EVANS
JUSTICE

190028F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

THE STATE OF TEXAS, Appellant

No. 05-19-00028-CV          V.

MESQUITE CREEK
DEVELOPMENT, INC., A
GEORGIA CORPORATION, and
RACETRAC PETROLEUM, INC.,
A GEORGIA CORPORATION,
Appellees

On Appeal from the County Court at
Law No. 2, Dallas County, Texas
Trial Court Cause No. CC-14-05842-
B.
Opinion delivered by Justice Evans.
Justices Myers and Nowell
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and this cause is **REMANDED** to the trial court for further proceedings consistent with that opinion.

It is **ORDERED** that appellant THE STATE OF TEXAS recover its costs of this appeal from appellees MESQUITE CREEK DEVELOPMENT, INC., A GEORGIA CORPORATION, and RACETRAC PETROLEUM, INC., A GEORGIA CORPORATION.

Judgment entered December 31, 2020.